ORIGINAL

FILED
AUG 2 4 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| American Automar, Inc.<br><br>v.<br><br>The United States | No. 04-1377C |

**COMPLAINT**

For its Complaint the Plaintiff alleges as follows:

**COUNT I**

**(Failure to Timely Exercise Contract Options)**

Jurisdiction.

1. The Plaintiff, American Automar Inc., is a corporation incorporated in the State of Delaware. It has its principal place of business at 6550 Rock Spring Drive, Suite 300, Bethesda, Maryland 20817.

2. By letter dated June 22, 2004, Plaintiff filed a certified claim under the Contract Disputes Act (CDA) of 1978 (41 U.S.C § 601, et.seq.) with the Contracting Officer with respect to disputed issues, and demanded a final decision. The Contracting Officer issued his final decision on August 18, 2004 denying Plaintiff's CDA claim in its entirety.

3. This action seeks monetary damages and a declaration of the parties' contractual rights pursuant to 41 U.S.C. § 601, et.seq., and 28 U.S.C. § 1492(a)(2).

Factual Background Relevant to Current Dispute.

4. The Contracting Officer having responsibility for the dispute at issue in this appeal is: K.D. Allen, Contracting Officer, Military Sealift Command (MSC), Department of the Navy, 914 Charles Morris Court, S.E., Washington Navy Yard, D.C. 20398-5540.

5. The Contracting Officer issued a letter (Reference - 5000 - Ser PM5, 15 June 2004) under Contract NOO033-02-C-5505 attempting to exercise expired options on this contract.

6. Plaintiff contends that this Contracting Officer letter is, in the alternative, a breach of contract, an improper attempted exercise of expired options, a constructive change to the contract, and/or a cardinal change entitling Plaintiff to discontinue contract performance, and recover its actual costs of performing the work as directed by the Contracting Officer.

7. Pursuant to the Contracting Officer's direction in his June 15, 2004 and August 18, 2004 letters, American Automar is at this time continuing with its performance under the contract, while accumulating its increased costs for MSC's account. Plaintiff reserves its rights at law to discontinue performance;

it contends the Contracting Officer's actions are a cardinal change, and breach of contract excusing further contract performance.

8. It is estimated that American Automar's costs already incurred and to be incurred in the future for operating the ship are at least $27,000.00 per day, plus profit. The Contracting Officer's final decision of August 18, 2004 states that the Government will only pay $19,900.00 per day for continued performance.

9. The Plaintiff is now losing very significant amounts of money by being required by the Contracting Officer to perform this contract. Plaintiff asserts it is not required to perform this work because the Government failed to timely exercise the contract option provisions for requiring continued performance.

10. If Plaintiff were making significant profits on this contract, the Contracting Officer could decide not to exercise the contract options; the Government is required by regulations to "test the market" and go to lower cost sources. FAR § 17.207(c) and 17.207(d).

11. Plaintiff's information is that its ship used here for contract performance - the AMERICAN TERN - is the only ice capable, U.S. flagged, container transport ship suitable for its missions. In addition, this MSC contract is unique - there is

only one container ship being utilized to re-supply the Antarctic mission at McMurdo Sound, Antarctica, and the mission at Thule, Greenland. That ship is the AMERICAN TERN.

The 17-Month Option Provision.

12. The contract is clear in setting forth the option periods: there are two 17-month option periods (Contract Drytime provision Box 4). These options follow the initial base contract's 17-month term; as the contract states:

> 4. Charter Period: Seventeen-months with two (2) seventeen-month option periods. Government's option to cancel after one year in any option period with sixty days prior notice.

13. In addition, MSC was required to exercise the next 17 month option period 30 days prior to the expiration of the preceding 17 month period. Contract Provision IV (e) states:

> "Optional periods shall be declared no later than thirty days prior to the expiration of the period then current".

14. Thus, Pursuant to Contract Paragraph IV (e), and Contract Drytime Block 4, MSC was obligated to exercise its option for the second 17-month period of this contract on or before Friday, April 23, 2004. This is 30 days prior to the end of the first 17-month term.

15. This first 17 month term's starting point was set by the contract to begin at the time of ship delivery, which actually occurred on December 24, 2002:

(Contract Provision Part IV(e), Charter Period)

> This Charter Party shall be for the period designated in Box 4, commencing upon the Charterer's acceptance of the vessel and continuing until either the date of her redelivery or the completion of the voyage then current, at Charterer's sole option. Any optional periods shall be stated in Box 4. . .

16. Therefore, the contract term starts on ship delivery, and ends in 17 months; 30 days before the end of this 17-month term any option exercise is due from the Government.

MSC's Failure to Timely Exercise the Seventeen-Month Option.

17. As explained above, given that the initial ship delivery occurred on December 24, 2002, MSC was obligated to exercise its option for the second 17-month term of this contract on or before Friday, April 23, 2004.

18. American Automar did not receive any notification by the April 23, 2004 date, either oral or written, that MSC was exercising the option.

19. The Contracting Officer did not even call Plaintiff until Tuesday, April 27, 2004. During this call, the Contracting Officer first raised the issue of the "missed" option date, and asked the Contractor whether this would be "a problem".

20. A series of negotiations between senior MSC and company officials ensued after April 27, 2004. MSC fully recognized that the option had expired. Automar was candid with

MSC, and explained that it could not perform the option now that it had expired because the company was losing money.

21. At no time during these discussions did MSC attempt to assert that the 17-month option was still "alive". That first attempt came in the Contracting Officer's June 15, 2004 letter cited above, which initiated this dispute proceeding.

22. The Contracting Officer did not "attempt" to exercise the option in writing until his letter of June 15, 2004, which is over 52 days later than the date required under the contract.

23. MSC's attempt to exercise the option was also made after the expiration of the original 17-month base contract term: May 23, 2004.

24. MSC knew April 23, 2004 was a firm option exercise date, and even referred to it as such on its web site for public review.

25. MSC also recognized that it missed the original option exercise date by its letter 4330, May 3, 2004, in which the Contracting Officer stated that the Government intended to redeliver the AMERICAN TERN on or about May 23, 2004 upon the discharge of all Government cargo (i.e. at the end of the voyage).

26. This MSC redelivery action is completely inconsistent with the Government's current, newfound argument that it still somehow retains the right to exercise the option.

27. Government contract case law holds that the Government may not unilaterally change or otherwise affect this 17-month option period, and the 30-day notice of exercise requirement prior to the end of the 17-month term.

MSC's Short-Term Contract Extension Does Not Excuse its Failure to Timely Exercise the Seventeen-month Option.

28. By letter dated May 5, 2004, the Contracting Officer unilaterally exercised its short-term right to extend services under the contract for a period of 90 days "until on or about 23 Aug 2004". There is no dispute that MSC has this separate short-term right to extend services: this is common in most Government service contracts. (This short-term option exercise was also untimely.)

29. The fact that MSC could continue to use the Plaintiff's ship, and pay the contracts daily fixed price rate for various brief periods after the expiration of the 17 month term (e.g. to complete a voyage) has absolutely nothing to do with the required exercise date for the 17-month option. Those dates for the exercising of the 17-month option are fixed by the

contract; they may not be changed by unilateral Government action.

30. This MSC action - exercising the standard short-term extension clause - is also fully consistent with the fact that the 17-month option exercise deadline had passed, and that MSC recognized it as such.

31. This short-term service option continuation allowed the ship, an ice-capable ship, to finish her summer voyage to Thule, Greenland.

32. In addition, the fact that the contract states all option periods shall be in "direct continuation" has nothing to do with the Government's failure to exercise the option within thirty days of the end of the first 17 month term. MSC is still required to exercise the options in accordance with the dates set forth in the contract: Drytime Box 4 and Provision IV(e). This is explained in detail in paragraphs 12 - 16, supra.

33. The Contracting Officer's June 15, 2004 letter, issued over 52 days after the first option period expired, appears to be simply an attempt by MSC's counsel to argue that MSC's exercise of the short-term, three month extension to finish a voyage somehow excuses its failure to timely extend the contract by invoking the 17-month separate option, which had long since expired.

34. This MSC attempt will not work as the case law shows that the Boards and Courts have repeatedly rejected arguments that the Government can unilaterally extend a firm option period.

35. The use and exercise of the short-term option was itself untimely; no 30-day notice was provided as required by the contract. This short-term option had expired.

<u>American Automar's Reservation of Rights During Continued Performance as Directed by the Government</u>.

36. The Government should be directed to pay the contractor's actual costs, plus a reasonable profit, for performing the remaining work under the contract after the failure to exercise options.

37. American Automar's current estimate is its equitable adjustment (cost plus reasonable profit) amounts to $29,000.00 per day or more versus the expired charter hire option rate of $19,900.00 per day, as asserted in the Contracting Officer's August 18, 2004 final decision.

38. Notwithstanding the financial hardship of such performance, American Automar intends to continue performing at this time pursuant to the Contracting Officer's direction while fully reserving its rights due to the Government's breach of the contract.

39. American Automar receives and accepts under protest the reduced charter hire payments of $19,900.00 per day, and seeks a ruling under the Contract Disputes Act holding that it is entitled to full compensation for its actual costs of performance plus a reasonable profit ($29,000.00 plus). Alliant Techsystems v. United States, 186 F.3d 1379 and 178 F.3d 1260 (Fed.Cir. 1999).

**COUNT II**

**(Breach of Contract/Cardinal Change)**

40. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 39 above as if fully set forth herein.

41. In the alternative, Plaintiff is entitled to treat the Government's actions herein as a breach of contract and discontinue all performance under this contract. The Government's attempt to direct continued performance under expired options is a cardinal change, and a breach of contract, which Plaintiff has no obligation to perform.

42. Plaintiff hereby asserts that the Government's actions set out above constitute a cardinal change/breach of contract, excusing its future performance upon the Court's so ruling.

**Count III**

**(Declaration of Contracting Parties Rights in Current Case)**

43. Plaintiff repeats and re-alleges each allegation in paragraphs 1 - 42 above as if fully set forth herein.

44. Pursuant to 41 U.S.C § 601, et.seq. and 28 U.S.C. § 1492(a)(2), Plaintiff hereby requests that the Court declare the parties respective rights regarding the option exercise in this suit.

45. Commencing with the Court's decision in International Telephone and Telegraph v. United States, 453 F.2d 1283 (Ct.Cl. 1972) it has been consistently held that (i) the Government must exercise an option on or before the date that the option exercise is due, (ii) the exercise must be in writing, (iii) the option exercise must be transmitted to the contractor, and (iv) the option must be unconditional.

46. It is also established law that Government attempts to unilaterally extend an option date (in this current case apparently through the use of a short-term continuation of service) are not effective.

47. No unilateral action by the Government extends an option exercise date. The contractor must agree to an extension of the exercise date or the reference point from which the option exercise is determined.

48. Absent such bilateral action or agreement by the contractor, the Government's unilateral attempt to extend an option exercise date is not effective. E.g., Universal American Enterprises, Inc., ASBCA No 22,562, 81-1 BCA ¶ 14942; Safeguard Maintenance Corp., IBCA No. 3379-E, 95-1 BCA ¶ 27,383.

49. The Government's June 15, 2004 letter attempting to exercise the option is additionally defective because it is stated as being conditional upon the availability of funding. As the Board held in J.E.T.S, Inc., ASBCA 26135. 82-2 BCA ¶ 15,986, an option exercise must be unconditional to be effective.

50. This Board has found that the inclusion of availability of funding language is enough, in and of itself, to render an option exercise conditional and of no effect. See also FAR § 17.207(a)(1). The same situation exists in this case as demonstrated by the Contracting Officer's June 15, 2004 letter, which contains conditional funding language.

51. There are also numerous Board and Court cases holding that any unilateral attempt by the Government to extend the option exercise date after it has expired is ineffective:

a. In White Sands Construction, Inc. 2004 W.L. 870704, the Board held that the Government's untimely exercise of the

first option made any subsequent exercise attempts at the second option exercise date ineffectual. The Board specifically granted the contractor a total cost recovery -- all of its costs of performance plus reasonable profit, less the amount that it was paid by the Government. The original contract price was properly disregarded.

b. The Board also held that all preliminary notices with respect to the exercise of the option had to be given in a timely fashion for the option to be effectively exercised. In the present situation, MSC has not done any of these things.

c. The Interior Board of Contract Appeals has also held that if Option Clause language is in any way ambiguous, such ambiguity is the Government's responsibility as the draftsman, and the clause will therefore be construed against the Government: again strict compliance with the stated notice requirements, and notice at the earliest possible date, is required for an effective option exercise. Jim Phillips Contracting, Inc., IBCA No. 4319, 04-1 BCA ¶ 32,416.

d. Even when the option exercise date is keyed to an external event, and not to a specific date in the contract, the Board has been rigorous in finding untimely option exercises invalid. The option must be exercised by the earliest possible

date that the event occurred, and not based upon Government speculation and conjecture about when various events happened. The Boeing Company, ASBCA 37579, 90-3 BCA ¶ 23,202.

**Quantum of Recovery**

52. The foregoing cases establish that when the Government has improperly exercised an option, and forced the contractor to go forward with the work, it is not permitted to simply pay the previous contract price.

53. The contractor is entitled to an equitable adjustment in which it recovers its actual cost of performance plus reasonable profit. As stated here, Automar's current estimate is that its actual costs of performance, plus reasonable profit, is at least $29,000.00 per day. This will result in losses of $3 million per year or more for the continued performance, which the Contracting Officer has directed.

54. Plaintiff, American Automar hereby demands payment of these amounts to which it is entitled, plus interest under the Contract Disputes Act. It asks for the Court's declaration of these rights.

**WHEREFORE**, Plaintiff is entitled to the following relief in this case:

a. A judgment against the United States for its actual costs of performance plus a reasonable profit for all work done during expired option periods; $7,000.00 per day from May 23, 2004 to date of judgment.

b. A judgment against the United States that it is no longer obligated to perform the subject contract.

c. A declaration of the parties' respective rights under the contract with respect to all option issues raised in this complaint.

Respectfully submitted,

Donald C. Holmes
Attorney for
American Automar Inc.
Holmes, Schwartz & Gordon
205 Main Street
P.O. Box 339
Preston, MD 21655
(410) 820-9724 (telephone)
(410) 820-9640 (facsimile)

Dated: August 24, 2004

Of Counsel:

Roy E. Bowman, Esquire
American Automar, Inc.
6550 Rock Spring Dr., Suite 300
Bethesda, MD 20817

Michael A. Gordon, Esquire
Holmes, Schwartz & Gordon
17 West Jefferson St., Suite 202
Rockville, Maryland 20850